# Exhibit A

# Attachment of Unpublished Opinions

Pages 3-16:

*Janus v. AFSCME Council 31*,
No. 19-1553, 2019 U.S. App. LEXIS 33071 (7th Cir. Nov. 5, 2019)

Pages 17-24:

*Laspina v. SEIU Pa. State Council*
No. 3:18-2018, 2019 U.S. Dist. LEXIS 147506 (M.D. Pa. Aug. 29, 2019)

⚠️ Caution
As of: November 19, 2019 10:45 PM Z

## *Janus v. Am. Fed'n. of State*

United States Court of Appeals for the Seventh Circuit

September 20, 2019, Argued; November 5, 2019, Decided

No. 19-1553

**Reporter**
2019 U.S. App. LEXIS 33071 *; __ F.3d __; 2019 WL 5704367

MARK JANUS, Plaintiff-Appellant, v. AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 31; AFL-CIO, et al., Defendants-Appellees, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, Intervenor-Defendant-Appellee.

**Prior History:** **[\*1]** Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 1:15-cv-01235 — Robert W. Gettleman, Judge.

*Janus v. Am. Fedn. of State, 2019 U.S. Dist. LEXIS 43152 (N.D. Ill., Mar. 18, 2019)*

## Core Terms

fair-share, First Amendment, retroactive, good faith, good-faith, nonmembers, district court, private party, employees, immunity, rights, agency fee, state law, benefits, purposes, cases, collective bargaining agreement, exclusive representative, qualified immunity, public-sector, agency-shop, damages, constitutional right, collected, windfall, parties, color, color of state law, state action, restitution

## Case Summary

### Overview

HOLDINGS: [1]-Where after the U.S. Supreme Court reversed its prior position and held that compulsory fair-share or agency fee arrangements impermissibly infringed on employees' *First Amendment* rights, an employee who paid fair-share fees under protest was not entitled to a refund of some or all of that money; [2]-In particular, the employee was not entitled to a refund because the union, acting as a private party who acted under color of state law for purposes of *§ 1983*, was entitled to a good faith defense to *§ 1983* liability, and this defense was established because at the time it collected the fees, the union had a legal right to receive and spend fair-share fees collected from nonmembers as long as it complied with state law and the applicable line of caselaw and it did not demonstrate bad faith when it followed those rules.

### Outcome
Decision affirmed.

## LexisNexis® Headnotes

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

*HN1*[⤓] **Fundamental Freedoms, Freedom of Speech**

In Janus, the U.S. Supreme Court held that agency-shop arrangements that require nonmembers to pay fair-share fees and thereby subsidize private speech on matters of substantial public concern, are inconsistent with the *First Amendment* rights of objectors, no matter what interest the state identifies in its authorizing legislation.

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN2*[⤓] **Summary Judgment Review, Standards of Review**

Where an appeal presents only questions of law, appellate courts review the district court's grant of summary judgment de novo.

Civil Rights Law > Protection of Rights > Section 1983 Actions > Elements

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

*HN3*[⬇] **Section 1983 Actions, Elements**

*Section 1983* supports a civil claim against every person who, under color of any statute. of any State subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. *42 U.S.C.S. § 1983*.

Civil Rights Law > Protection of Rights > Section 1983 Actions > Elements

*HN4*[⬇] **Section 1983 Actions, Elements**

To be liable under *42 U.S.C.S. § 1983* a defendant must be a "person" as Congress used that term. While "person" is a broad word, the U.S. Supreme Court has held that states do not fall within its compass. It is hard to find other exclusions. A union, as an unincorporated organization, is a suable "person," and it is sufficiently like other entities that have been sued under *§ 1983* to permit an action.

Civil Rights Law > ... > Elements > Color of State Law > State Agents

*HN5*[⬇] **Color of State Law, State Agents**

Unions generally are private organizations. Nonetheless, private actors sometimes fall within *42 U.S.C.S. § 1983*. Indeed, the "color of law" requirement for *section 1983* is more expansive than, and wholly encompasses, the "state action" requirement under the *Fourteenth Amendment*. If a union's receipt from of fees is attributable to the state, then the "color of law" requirement is satisfied.

Civil Rights Law > ... > Elements > Color of State Law > Participation as State Action

Civil Rights Law > ... > Elements > Color of State

Law > State-Authorized Actions

*HN6*[⬇] **Color of State Law, Participation as State Action**

A procedural scheme created by statute obviously is the product of state action and properly may be addressed in a *42 U.S.C.S. § 1983* action. When private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found.

Civil Rights Law > Protection of Rights > Procedural Matters > Statute of Limitations

*HN7*[⬇] **Procedural Matters, Statute of Limitations**

*42 U.S.C.S. § 1983* does not have its own organic statute of limitations but rather borrows the state statute of limitations for personal-injury actions. In Illinois, this is two years. *735 ILCS § 5/13-202*. The claim accrues when the plaintiff knows or should know that his or her constitutional rights have been violated.

Civil Procedure > Remedies

Governments > Legislation > Effect & Operation > Retrospective Operation

*HN8*[⬇] **Civil Procedure, Remedies**

Retroactivity and remedy are distinct questions. Retroactive application does not determine what appropriate remedy, if any, the defendant should obtain. The U.S. Supreme Court has never equated its retroactivity principles with remedial principles. It thus does not necessarily follow from retroactive application of a new rule that the defendant will gain the precise type of relief she seeks. To the contrary, the Supreme Court has acknowledged that the retroactive application of a new rule of law does not deprive respondents of their opportunity to raise reliance interests entitled to consideration in determining the nature of the remedy that must be provided.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

*HN9*[⬇] **Immunity From Liability, Defenses**

While a private party acting under color of state law does not enjoy qualified immunity from suit, it is entitled to raise a good-faith defense to liability under *42 U.S.C.S. § 1983*.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Civil Rights Law > Protection of Rights > Procedural Matters

*HN10*[⬇] **Immunity From Liability, Defenses**

In Wyatt I, the U.S. Supreme Court confirmed that its ruling rejecting qualified immunity did not foreclose the possibility that private defendants faced with *42 U.S.C.S. § 1983* liability under Lugar could be entitled to an affirmative defense based on good faith and/or probable cause or that *§ 1983* suits against private, rather than governmental, parties could require plaintiffs to carry additional burdens.

Civil Rights Law > Protection of Rights > Procedural Matters

Civil Rights Law > ... > Elements > Color of State Law > State Agents

*HN11*[⬇] **Protection of Rights, Procedural Matters**

The U.S. Court of Appeals for the Seventh Circuit joins its sister circuits in recognizing that, under appropriate circumstances, a private party that acts under color of law for purposes of *42 U.S.C.S. § 1983* may defend on the ground that it proceeded in good faith.

Torts > Intentional Torts > Conversion > Defenses

*HN12*[⬇] **Conversion, Defenses**

There are at least two privileges that may be relevant to a conversion-style claim: authority based upon public interest and privilege to act pursuant to court order, One is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if he is acting in discharge of a duty or authority created by law to preserve the public safety, health, peace, or other public interest, and his act is reasonably necessary to the performance of his duty or the exercise of his authority.

Torts > Intentional Torts > Abuse of Process > Elements

*HN13*[⬇] **Abuse of Process, Elements**

Abuse of process occurs where a party uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed.

Civil Procedure > Pleading & Practice > Responses > Defenses, Demurrers & Objections

Civil Rights Law > Protection of Rights > Section 1983 Actions > Elements

Civil Rights Law > Protection of Rights > Procedural Matters

*HN14*[⬇] **Responses, Defenses, Demurrers & Objections**

The U.S. Court of Appeals for the Seventh Circuit reads the U.S. Supreme Court's language in Wyatt I and Lugar, supplemented by Justice Kennedy's opinion concurring in Wyatt I, as a strong signal that the Court intended, when the time was right, to recognize a good-faith defense in *42 U.S.C.S. § 1983* actions when the defendant reasonably relies on established law. This is not a simple mistake of law defense.

Civil Procedure > Pleading & Practice > Responses > Defenses, Demurrers & Objections

Civil Rights Law > Protection of Rights > Section 1983 Actions

*HN15*[⬇] **Responses, Defenses, Demurrers & Objections**

The good-faith defense to *42 U.S.C.S. § 1983* liability is narrow. It is not true that this defense will be available to every defendant that deprives any person of any constitutional right. The U.S. Court of Appeals for the Seventh Circuit recognizes a good-faith defense for private parties who act under color of state law for

**Counsel:** For MARK JANUS, Plaintiff - Appellant: William L. Messenger, Attorney, NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION, Springfield, VA; Jeffrey M. Schwab, Attorney, LIBERTY JUSTICE CENTER, Chicago, IL.

For AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 31, AFL-CIO, Defendant - Appellee: John M. West, Attorney, BREDHOFF & KAISER, PLLC, Washington, DC; Melissa J. Auerbach, Attorney, Stephen Anthony Yokich, Attorney, DOWD, BLOCH, BENNETT, CERVONE, AUERBACH & YOKICH, Chicago, IL.

For JANEL L. FORDE, In her official capacity as Director of Illinois Department of Central Management, Defendant - Appellee: Frank Henry Bieszczat, Attorney, OFFICE OF THE ATTORNEY GENERAL, Civil Appeals Division, Chicago, IL.

For GENERAL TEAMSTERS, PROFESSIONAL & TECHNICAL EMPLOYEES LOCAL UNION NO. 916, Defendant: Carl R. Draper, Attorney, FELDMAN, WASSER, DRAPER & COX, Springfield, IL.

For KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, Intervenor - Appellee: Frank Henry Bieszczat, Attorney, OFFICE OF THE ATTORNEY **[*2]** GENERAL, Civil Appeals Division, Chicago, IL.

**Judges:** Before WOOD, Chief Judge, and MANION and ROVNER, Circuit Judges. MANION, Circuit Judge, concurring.

Opinion by: WOOD

# Opinion

WOOD, *Chief Judge.* For 41 years, explicit Supreme Court precedent authorized state-government entities and unions to enter into agreements under which the unions could receive fair-share fees from nonmembers to cover the costs incurred when the union negotiated or acted on their behalf over terms of employment. *Abood v. Detroit Bd. of Educ., 431 U.S. 209, 97 S. Ct. 1782, 52 L. Ed. 2d 261 (1977).* To protect nonmembers' *First Amendment* rights, fair-share fees could not support any of the union's political or ideological activities. Relying on *Abood,* more than 20 states created statutory schemes that allowed the collection of fair-share fees,

and public-sector employers and unions in those jurisdictions entered into collective bargaining agreements pursuant to these laws.

In 2018, the Supreme Court reversed its prior position and held that compulsory fair-share or agency fee arrangements impermissibly infringe on employees' *First Amendment* rights. *Janus v. AFSCME, Council 31, 138 S. Ct. 2448, 2461, 201 L. Ed. 2d 924 (2018).* The question before us now is whether Mark Janus, an employee who paid fair-share fees under protest, is entitled to a refund of some or all of that money. We hold that he is not, and so we affirm the judgment **[*3]** of the district court.

## I

A. History of Agency Fees

Before turning to the specifics of the case before us, we think it useful to take a brief tour of the history behind agency fees. This provides useful context for our consideration of Mr. Janus's claim and the system he challenged.

The principle of exclusive union representation lies at the heart of our system of industrial relations; it is reflected in both the *Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-165* (first enacted in 1926), and the *National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-169* (first enacted in 1935). In its quest to provide for "industrial peace and stabilized labor-management relations," Congress authorized employers and labor organizations to enter into agreements under which employees could be required either to be union members or to contribute to the costs of representation—so-called "agency-shop" arrangements. See *29 U.S.C. §§ 157,* *158(a)(3)*; *45 U.S.C. § 152* Eleventh. Unions designated as exclusive representatives were (and still are) obligated to represent all employees, union members or not, "fairly, equitably, and in good faith." H.R. Rep. No. 2811, 81st Cong., 2d Sess., p. 4.

In *Railway Employment Dep't v. Hanson, 351 U.S. 225, 76 S. Ct. 714, 100 L. Ed. 1112 (1956),* a case involving the RLA, the Supreme Court held that "the requirement for financial support of the collective-bargaining **[*4]** agency by all who receive the benefits of its work is within the power of Congress under the *Commerce Clause* and does not violate either the First or the *Fifth Amendments.*" *Id. at 231.* In approving agency-shop arrangements, the Court said, "Congress endeavored to

safeguard against [the possibility that compulsory union membership would impair freedom of expression] by making explicit that no conditions to membership may be imposed except as respects 'periodic dues, initiation fees, and assessments.'" *Id.* Hanson thus held that the compulsory payment of fair-share fees did not contravene the *First Amendment*.

Several years later, in *Int'l Ass'n of Machinists v. Street, 367 U.S. 740, 81 S. Ct. 1784, 6 L. Ed. 2d 1141 (1961)*, the Court discussed the careful balancing of interests reflected in the RLA, observing that "Congress did not completely abandon the policy of full freedom of choice embodied in the [RLA], but rather made inroads on it for the limited purposes of eliminating the problems created by the 'free rider.'" *Id. at 767*. The Court reaffirmed the lawfulness of agency-shop arrangements while cautioning that unions could receive and spend nonmembers' fees only in accordance with the terms "advanced by the unions and accepted by Congress [to show] why authority to make union shop agreements was justified." *Id. at 768*. Legitimate expenditures **[*5]** were limited to those designed to cover "the expenses of the negotiation or administration of collective agreements, or the expenses entailed in the adjustment of grievances and disputes." *Id.* The Court left the question whether state public agencies were similarly empowered under state law to enter into agency-shop arrangements for another day.

That day came on May 23, 1977, when the Supreme Court issued its opinion in *Abood. 431 U.S. 209, 97 S. Ct. 1782, 52 L. Ed. 2d 261*. There, a group of public-school teachers challenged Michigan's labor relations laws, which were broadly modeled on federal law. *Id. at 223*. Michigan law established an exclusive representation scheme and authorized agency-shop clauses in collective bargaining agreements between public-sector employers and unions. *Id. at 224*. The Court upheld that system, stating that "[t]he desirability of labor peace is no less important in the public sector, nor is the risk of 'free riders' any smaller," *id.*, and that "[t]he same important government interests recognized in the *Hanson* and *Street* cases presumptively support the impingement upon associational freedom created by the agency shop here at issue." *Id. at 225*. It recognized that "government may not require an individual to relinquish rights guaranteed **[*6]** him by the *First Amendment* as a condition of public employment." *Id. at 233-34*. Nonetheless, it said that a public employee has no "weightier *First Amendment* interest than a private employee in not being compelled to contribute to the No. 19-1553 5 costs of exclusive union representation,"

*id. at 229*, and thus concluded that "[t]he differences between public- and private-sector collective bargaining simply do not translate into differences in *First Amendment* rights." *Id. at 232*.

The correct balance, according to *Abood*, was to "prevent[] compulsory subsidization of ideological activities by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities." *Id. at 237*. And for four decades following *Abood*, courts, state public-sector employers, and unions followed this path. See, *e.g.*, *Locke v. Karass, 555 U.S. 207, 129 S. Ct. 798, 172 L. Ed. 2d 552 (2009)*; *Lehnert v. Ferris Faculty Ass'n, 500 U.S. 507, 111 S. Ct. 1950, 114 L. Ed. 2d 572 (1991)*; *Chicago Teachers Union v. Hudson, 475 U.S. 292, 106 S. Ct. 1066, 89 L. Ed. 2d 232 (1986)*; *Ellis v. Railway Clerks, 466 U.S. 435, 104 S. Ct. 1883, 80 L. Ed. 2d 428 (1984)*. Agency-shop arrangements, the Court repeatedly held, were consistent with the *First Amendment* and validly addressed the risk of free riding. See *Comm'cns Workers of America v. Beck, 487 U.S. 735, 762, 108 S. Ct. 2641, 101 L. Ed. 2d 634 (1988)* ("Congress enacted the two provisions for the same purpose, eliminating 'free riders,' and that purpose dictates our construction of *§ 8(a)(3)* ... ."); *Ellis, 466 U.S. at 447, 452, 456* (referring in three places to the free-rider concern); see also *Lehnert, 500 U.S. at 556* (Scalia, J., concurring).

In time, however, the consensus **[*7]** on the Court began to fracture. Beginning in *Knox v. Serv. Emps. Int'l Union, 567 U.S. 298, 132 S. Ct. 2277, 183 L. Ed. 2d 281 (2012)*, the rhetoric changed. *Abood* began to be characterized as an "anomaly," and the Court started paying more attention to the "significant impingement on *First Amendment* rights" *Abood* allowed and less to the balancing of employees' rights and unions' obligations. *Id. at 310-11*. Building on *Knox*, *Harris v. Quinn* criticized the reasoning in *Hanson* and *Abood* as "thin," "questionable," and "troubling." *573 U.S. 616, 631-35, 134 S. Ct. 2618, 189 L. Ed. 2d 620 (2014)*. *Harris* worried that *Abood* had "failed to appreciate the conceptual difficulty of distinguishing between union expenditures that are made for collective-bargaining purposes and those that are made to achieve political ends" and to anticipate "the practical administrative problems that would result." *Id. at 637*. The *Harris* Court also suggested that "[a] union's status as exclusive bargaining agent and the right to collect an agency fee from non-members are not inextricably linked." *Id. at 649*.

Nonetheless, and critically for present purposes, these observations did not lead the Court in *Harris* to overrule *Abood*. Informed observers thought that *Abood* was on shaky ground, but it was unclear whether it would weather the storm, be restricted, or be overturned in its entirety. That uncertainty continued **[*8]** after the Court signaled its intention to revisit the issue in *Friedrichs v. California Teachers Ass'n, 135 S. Ct. 2933, 192 L. Ed. 2d 975 (2015)*, which wound up being affirmed by an equally divided Court. *136 S. Ct. 1083 (2016)*.

B. Janus's Case

Plaintiff Mark Janus was formerly a child-support specialist employed by the Illinois Department of Healthcare and Family Services. Through a collective bargaining agreement between Illinois's Department of Central Management Services ("CMS") (which handles human resources tasks for Illinois's state agencies) and defendant American Federation of State, County and Municipal Employees ("AFSCME"), Council 31, AFSCME was designated as the exclusive representative of Mr. Janus's employee unit. Mr. Janus exercised his right not to join the union. He also objected to CMS's withholding $44.58 from his paycheck each month to compensate AFSCME for representing the employee unit in collective bargaining, grievance processing, and other employment-related functions.

Initially, however, Mr. Janus was not involved in this litigation. The case began instead when the then-governor of Illinois challenged the *Illinois Public Labor Relations Act ("IPLRA")*, which established an exclusive representation scheme and authorized public employers and unions to enter into collective **[*9]** bargaining agreements that include a fair-share fee provision. *5 ILCS § 315/6*. Under that law, a union designated as the exclusive representative of an employee unit was "responsible for representing the interests of all public employees in the unit," whether union members or not, *§ 315/6(d)*. Fair-share fees were earmarked to compensate the union for costs incurred in "the collective bargaining process, contract administration and pursuing matters affecting wages, hours and conditions of employment." *§ 315/6(e)*.

The district court dismissed the governor for lack of standing, but at the same time it permitted Mr. Janus (and some others) to intervene as plaintiffs. Mr. Janus asserted that the state's compulsory fair-share scheme violated the *First Amendment*. He recognized that *Abood* stood in his way, but he argued that *Abood* was

wrongly decided and should be overturned by the high court. Although the lower courts that first considered his case rejected his position on the ground that they were bound by *Abood*, see *Janus v. AFSCME, Council 31, 851 F.3d 746, 747-48 (7th Cir. 2017) ("Janus I")*, Janus preserved his arguments and then, as he had hoped, the Supreme Court took the case.

This time, the Court overruled *Abood*. *Janus, 138 S. Ct. at 2486 ("Janus II")*.**HN1**[↑] It held that agency-shop arrangements that require nonmembers to pay fair-share **[*10]** fees and thereby "subsidize private speech on matters of substantial public concern," are inconsistent with the *First Amendment* rights of objectors, no matter what interest the state identifies in its authorizing legislation. *138 S. Ct. at 2460*. This is so, the Court explained, because "the *First Amendment* does not permit the government to compel a person to pay for another party's speech just because the government thinks that the speech furthers the interests of the person who does not want to pay." *Id. at 2467*.

Several aspects of the Court's opinion are relevant to Mr. Janus's current claim for damages. First, the Court characterized the harm inflicted by the agency-fee arrangement as "compelled subsidization of private speech," *138 S. Ct. at 2464*, whereby "individuals are coerced into betraying their convictions," *id.* It was not concerned in the abstract with the deduction of money from employees' paychecks pursuant to an employment contract. Rather, the problem was the lack of *consent* (where it existed) to the use of that money—*i.e.* to support the union's representation work. In other words, the case presented a *First Amendment* speech issue, not one under the *Fifth Amendment's Takings clause*.

The Court found that any legitimate interest AFSCME had in those fees had to yield to the objecting employees' **[*11]** *First Amendment* rights. In so doing, it rejected the approach to free riding that earlier opinions had taken, holding to the contrary that "avoiding free riders is not a compelling interest" and thus Illinois's statute could not withstand "exacting scrutiny." *138 S. Ct. at 2466*. Yet it came to that conclusion only after weighing the costs and benefits to a union of having exclusive representative status: on the one hand, the union incurs the financial burden attendant to the requirement to provide fair representation even for nonmembers who decline to contribute anything to the cost of its services; on the other hand, even with payments of zero from objectors, the union still enjoys the power and attendant privileges of being the exclusive representative of an employee unit. The

Court's analysis focused on the union rather than the nonmembers: the question was whether requiring a *union* to continue to represent those who do not pay even a fair-share fee would be sufficiently inequitable to establish a compelling interest, not whether requiring *nonmembers* to contribute to the unions would be inequitable.

Nor did the Court hold that Mr. Janus has an unqualified constitutional right to accept the benefits of union representation **[*12]** without paying. Its focus was instead on freedom of expression. That is why it said only that the state may not force a person to pay fees to a union with which she does not wish to associate. But if those unions were not designated as exclusive representatives (as they are under *5 ILCS §§ 315/6* and *315/9*), there would be no obligation to act in the interests of nonmembers. The only right the *Janus II* decision recognized is that of an objector not to pay *any* union fees. This is not the same as a right to a free ride. Free-riding is simply a consequence of exclusivity; drop the duty of fair representation, and the union would be free to cut off all services to the nonmembers.

Finally, the Court did not specify whether its decision was to have retroactive effect. The language it used, to the extent it points any way, suggests that it was thinking prospectively: "Those unconstitutional exactions cannot be allowed to continue indefinitely," *138 S. Ct. at 2486*; "States and public-sector unions may no longer extract agency fees from nonconsenting employees," *id*; "This procedure violates the *First Amendment* and cannot continue," *id*. In the end, however, the Court remanded the case to the district court for further proceedings, in particular **[*13]** those related to remedy. *Id. at 2486*.

C. District Court Proceedings

The most immediate effect of the Court's *Janus II* opinion was CMS's prompt cessation of its collection of fees from Mr. Janus and all other nonmembers of the union, and thus the end of AFSCME's receipt of those monies. That relief was undoubtedly welcome for those such as Mr. Janus who fundamentally disagree with the union's mission, but matters did not stop there. Still relying on *42 U.S.C. § 1983* for his right of action, Mr. Janus followed up on the Court's decision with a request for damages from AFSCME in the amount of all fair-share fees he had paid. The State of Illinois joined the litigation as an intervenor-defendant in support of AFSCME.

The district court entered summary judgment for AFSCME and Illinois on March 18, 2019. *Janus v. AFSCME, Council 31, No. 15 C 1235, 2019 U.S. Dist. LEXIS 43152, 2019 WL 1239780 (N.D. Ill. Mar. 18, 2019) ("Janus III")*. It began with the observation that in 1982, the Supreme Court held that private defendants could in some circumstances act "under color of state law" for purposes of *section 1983* by participating in state-created procedural schemes. *Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 941-42, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982)*. Although such private defendants are not entitled to the identical immunity defenses that apply to public defendants, the Court later indicated, they may be entitled to an affirmative **[*14]** defense based on good faith or probable cause. *Wyatt v. Cole, 504 U.S. 158, 169, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992) ("Wyatt I")*. Noting that "every federal appellate court that has considered the good faith defense [to a damages action] has found that it exists for private parties," the court followed that rule and found that the defense applies here. The key question, it said, is whether the defendant's reliance on an existing law was in good faith. Given the fact that "the statute on which defendant relied had been considered constitutional for 41 years," it found good faith. In so doing, it rejected the idea that earlier intimations from the Court that *Abood* ought to be overruled undermined the necessary good faith. Accordingly, it held that Mr. Janus was not entitled to damages.

Mr. Janus timely filed a notice of appeal on March 27, 2019. We heard oral argument in both Mr. Janus's appeal and a related case, *Mooney v. Ill. Educ. Ass'n*, No. 19-1774, on September 20, 2019. The predicate for each case is the same—the Supreme Court's decision in *Janus II*—but whereas Mr. Janus seeks damages from the union, Mooney insists that her claim lies in equity and is one for restitution. As we explain in more detail in a separate opinion filed in *Mooney*, we find **[*15]** no substantive difference in the two theories of relief, and so much of what we have to say here also applies to Mooney's case.

II

*HN2*[⬆] ] This appeal presents only questions of law. Accordingly, we review the district court's grant of summary judgment in favor of AFSCME *de novo*. *Mazzei v. Rock-N-Around Trucking, Inc., 246 F.3d 956, 959 (7th Cir. 2001)*.

A. Retroactivity

We begin with the question whether *Janus II* is

retroactive. If it is not, that is the end of the line for Mr. Janus, because the union's collection of fair-share fees was expressly permitted by state law and Supreme Court precedent from the time he started his covered work until the Court's decision, which all agree marked the end of his payments. If it is, then we must reach additional questions that also bear on the proper resolution of the case. As we noted earlier, the Supreme Court's opinion did not address retroactivity in so many words.

Mr. Janus relies primarily on *Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 113 S. Ct. 2510, 125 L. Ed. 2d 74 (1993)*, for the proposition that "a rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law." *Id. at 97*; see also *Reynoldsville Casket Co. v. Hyde, 514 U.S. 749, 752, 115 S. Ct. 1745, 131 L. Ed. 2d 820 (1995)* ("*Harper*... held that, when (1) the Court decides a case and applies the (new) legal rule of that case to the parties before it, **[*16]** then (2) it and other courts must treat that same (new) legal rule as 'retroactive,' applying it, for example, to all pending cases, whether or not those cases involve predecision events."). Mr. Janus's assertion is that *all* Supreme Court cases, without exception, "must be applied retroactively." AFSCME responds that "[i]t is not at all clear, in the first place, that the Supreme Court's decision in this case is to be applied retroactively."

We agree with AFSCME that the rules of retroactivity are not as unbending as Mr. Janus postulates. Even in *Harper*, the Court said only that its "consideration of remedial issues meant necessarily that we retroactively applied the rule we announced ... to the litigants before us." *509 U.S. at 99*. Right and remedy are two different things, and the Court has taken great pains to evaluate them separately. See, *e.g., Franklin v. Gwinnett Cnty. Pub. Schs., 503 U.S. 60, 65-66, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992)* ("As we have often stated, the question of what remedies are available under a statute that provides a private right of action is 'analytically distinct' from the issue of whether such a right exists in the first place.").

Retroactivity poses some knotty problems. The Supreme Court disapproved of what it called "selective prospectivity" in *Harper* (that **[*17]** is, application of the new rule to the party before the court but not to all others whose cases were pending), but it did not close the door on "pure prospectivity"—*i.e.*, wholly prospective force, equally inapplicable to the parties in the case that

announces the rule and all others—as used in *Lemon v. Kurtzman, 411 U.S. 192, 93 S. Ct. 1463, 36 L. Ed. 2d 151 (1973)* ("*Lemon II*"). In that case, after invalidating a Pennsylvania program permitting nonpublic sectarian schools to be reimbursed for secular educational services, see *Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971)* ("*Lemon I*"), the Court affirmed a district court order permitting the state to reimburse the schools for all services performed up to the date of *Lemon I. Lemon II, 411 U.S. at 194*. One could argue that similar reliance interests on the part of AFSCME and the state argue for pure prospectivity here.

On the other hand, in later decisions the Supreme Court has stated that the "general practice is to apply the rule of law we announce in a case to the parties before us ... even when we overrule a case." *Agostini v. Felton, 521 U.S. 203, 237, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997)*. Only when there is "grave disruption or inequity involved in awarding retrospective relief to the petitioner" does the option of pure prospectivity come into play. *Ryder v. United States, 515 U.S. 177, 184-85, 115 S. Ct. 2031, 132 L. Ed. 2d 136 (1995)*. See also *Suesz v. Med-1 Sols., LLC, 757 F.3d 636, 650 (7th Cir. 2014)* (*en banc*).

Rather than wrestle the retroactivity question to the ground, we think it prudent **[*18]** to assume for the sake of argument that the *right* recognized in *Janus II* should indeed be applied to the full sweep of people identified in *Harper* (that is, Mr. Janus himself and all others whose cases were in the pipeline at the time of the Court's decision). That appears also to be the approach the district court took. We thus turn to the broader question whether Mr. Janus is entitled to the remedy he seeks.

B. Requirements under *Section 1983*

**HN3[↑]** *Section 1983* supports a civil claim against "every person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *42 U.S.C. § 1983*.

*1. AFSCME is a "person" that can be sued*

**HN4[↑]** To be liable under *section 1983* a defendant must be a "person" as Congress used that term. While "person" is a broad word, the Supreme Court has held

that states do not fall within its compass. See *Will v. Michigan Dep't of State Police, 491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)*. But it is hard to find other exclusions. The union, as an unincorporated organization, is a suable "person," and we are satisfied that it is sufficiently like other entities that have been sued under *section 1983* to permit this action. Compare *Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* (municipalities and other local [*19] government units are "persons" for purposes of *section 1983*); *Walsh v. Louisiana High School Athletic Ass'n, 616 F.2d 152, 156 (5th Cir. 1980)* (voluntary association of schools); *Frohwerk v. Corr. Med. Servs., 2009 U.S. Dist. LEXIS 78588, 2009 WL 2840961 (N.D. Ind. Sept. 1, 2009)* (prison contractors). *Cf. Citizens United v. Fed. ElectionComm'n, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010)*.

*2. AFSCME acted "under color of" state law*

The next question is whether AFSCME acted under color of state law. **HN5**[↑] Unions generally are private organizations. See, *e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7, 570 F.3d 811, 815 (7th Cir. 2009)*. Nonetheless, private actors sometimes fall within the statute. See *Lugar, 457 U.S. at 935*. Indeed, the "color of law" requirement for *section 1983* is more expansive than, and wholly encompasses, the "state action" requirement under the *Fourteenth Amendment*. *Id.* For our purposes, the analysis is the same—if AFSCME's receipt from CMS of the fair-share fees is attributable to the state, then the "color of law" requirement is satisfied.

**HN6**[↑] A "procedural scheme created by ... statute obviously is the product of state action" and "properly may be addressed in a *section 1983* action." *Id. at 941*. "[W]hen private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." *Tulsa Prof'lCollection Servs., Inc. v. Pope, 485 U.S. 478, 108 S. Ct. 1340, 99 L. Ed. 2d 565 (1988)*; see also *Apostol v. Landau, 957 F.2d 339, 343 (7th Cir. 1992)*. Here, AFSCME was a joint participant with the state in the agency-fee arrangement. CMS deducted fair-share fees from the employees' paychecks and transferred that money to the union, which then spent it on authorized labor-management activities pursuant [*20] to the collective bargaining agreement. This is sufficient for the union's conduct to amount to state action. We therefore conclude that AFSCME is a proper defendant under *section 1983*.

C. Statute of Limitations

Mr. Janus's claim is also timely under the applicable statute of limitations. **HN7**[↑] *Section 1983* does not have its own organic 16 No. 19-1553 statute of limitations but rather borrows the state statute of limitations for personal-injury actions. *Wilson v. Garcia, 471 U.S. 261, 279, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985)*. In Illinois, this is two years. *735 ILCS § 5/13-202*. "The claim accrues when the plaintiff knows or should know that his or her constitutional rights have been violated." *Draper v. Martin, 664 F.3d 1110, 1113 (7th Cir. 2011)*.

In this case, the statute began running on the date of the Supreme Court's decision in *Janus II*: June 27, 2018. Mr. Janus neither knew nor should have known any earlier that his constitutional rights were violated, because before then it was the settled law of the land that the contrary was true. Thus, his suit is timely.

**III**

A. Existence of Good-faith Defense

We now turn to the ultimate question in this case: to what remedy or remedies is Mr. Janus entitled? As the Supreme Court wrote in *Davis v. United States, 564 U.S. 229, 131 S. Ct. 2419, 180 L. Ed 2d 285 (2011)*, **HN8**[↑] retroactivity and remedy are distinct questions. "Retroactive application does not ... determine what 'appropriate remedy' (if [*21] any) the defendant should obtain." *Id. at 243*; see also *American Trucking Ass'ns, Inc. v. Smith, 496 U.S. 167, 189, 110 S. Ct. 2323, 110 L. Ed. 2d 148 (1990)* (plurality opinion) ("[T]he Court has never equated its retroactivity principles with remedial principles...."). It thus does not necessarily follow from retroactive application of a new rule that the defendant will gain the precise type of relief she seeks. See *Powell v. Nevada, 511 U.S. 79, 84, 114 S. Ct. 1280, 128 L. Ed. 2d 1 (1994)*. To the contrary, the Supreme Court has acknowledged that the retroactive application of a new rule of law does not "deprive[] respondents of their opportunity to raise ... reliance interests entitled to consideration in determining the nature of the remedy that must be provided." *James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 544, 111 S. Ct. 2439, 115 L. Ed. 2d 481 (1991)*.

Sometimes the law recognizes a defense to certain types of relief. An example that comes readily to mind is

the qualified immunity doctrine, which is available for a public employee if the asserted constitutional right that she violated was not clearly established. See, *e.g.*, *Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*. We must decide whether a union may raise any such defense against its liability for the fair-share fees it collected before *Janus II.*

This is a matter of first impression in our circuit. But, as the district court noted, every federal appellate court to have decided the question has held that, *HN9*[↑] while a private party [*22] acting under color of state law does not enjoy qualified immunity from suit, it is entitled to raise a good-faith defense to liability under *section 1983*. See *Clement v. City of Glendale, 518 F.3d 1090, 1096-97 (9th Cir. 2008)*; *Pinsky v. Duncan, 79 F.3d 306, 311-12 (2d Cir. 1996)*; *Vector Research, Inc. v. Howard & Howard Attorneys P.C., 76 F.3d 692, 698-99 (6th Cir. 1996)*; *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1275-78 (3d Cir. 1994)*; *Wyatt v. Cole, 994 F.2d 1113, 1118-21 (5th Cir. 1993)* ("*Wyatt II*").

Mr. Janus takes issue with this consensus position. He points to the text of *section 1983*, which we grant says nothing about immunities or defenses. That, he contends, is the end of the matter. "Shall be liable to the party injured" is mandatory language that, in his view, allows for no exceptions. The problem with such an absolutist position, however, is that the Supreme Court abandoned it long ago, when it recognized that liability under *section 1983* is subject to common-law immunities that apply to all manner of defendants.

The Court discussed that history in *Wyatt I*, where it noted that despite the bare-bones text of *section 1983*, it had "accorded certain government officials either absolute or qualified immunity from suit if the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine." *504 U.S. at 163-64* (quoting *Owen v. City of Independence, 445 U.S. 622, 637, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980))* (internal quotation marks omitted). In *Wyatt I*, the Court had to decide how far its immunity jurisprudence reached, [*23] and specifically, whether *private* parties acting under color of state law would have been able, at the time *section 1983* was enacted (in 1871), to invoke the same immunities that public officials had. (That is more than a bit counterfactual, as the Court did not recognize this type of private liability until 1982, but we put that to one side.) Surveying its immunity jurisprudence, including *Mitchell v. Forsyth, 472 U.S.*

*511, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)*, *Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*, *Wood v. Strickland, 420 U.S. 308, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975)*, and *Pierson v. Ray, 386 U.S. 547, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967)*, the Court "conclude[ed] that the rationales mandating qualified immunity for public officials are not applicable to private parties." *504 U.S. at 167*.

The Court recognized that this outcome risked leaving private defendants in the unenviable position of being just as vulnerable to suit as public officials, per *Lugar*, but not protected by the same immunity. *Id. at 168*. But, critically for AFSCME, the Court pointed toward the solution to that problem. It distinguished between defenses to suit and immunity from suit, the latter of which is more robust, in that it bars recovery regardless of the merits. *Id. at 166*. *HN10*[↑] It then confirmed that its ruling rejecting qualified immunity did "not foreclose the possibility that private defendants faced with *§ 1983* liability under [*Lugar*] could be entitled to an affirmative defense based on good faith and/or [*24] probable cause or that *§ 1983* suits against private, rather than governmental, parties could require plaintiffs to carry additional burdens." *Wyatt I, 504 U.S. at 169*.

Mr. Janus rejects the line that the Court drew between qualified immunity and a defense to liability; he sees it as nothing but a labeling game. But *Wyatt I* directly refutes this criticism. Adding to the language above from the majority, Justice Kennedy, in concurrence, explained why a defense on the merits might be available for private parties even if immunity is not. "By casting the rule as an immunity, we imply the underlying conduct was unlawful, a most debatable proposition in a case where a private citizen may have acted in good-faith reliance upon a statute." *504 U.S. at 173* (Kennedy, J., concurring). The distinction between an immunity and a defense is one of substance, not just nomenclature, and "is important because there is support in the common law for the proposition that a private individual's reliance on a statute, prior to a judicial determination of unconstitutionality, is considered reasonable as a matter of law." *Id. at 174*; see also *Lugar, 457 U.S. at 942 n.23* ("Justice Powell is concerned that private individuals who innocently make use of seemingly valid state laws would be responsible, [*25] if the law is subsequently held to be unconstitutional, for the consequences of their actions. In our view, however, this problem should be dealt with not by changing the character of the cause of action but by establishing an affirmative defense.").

The *Wyatt I* Court remanded the case to the Fifth Circuit, which decided that the "question left open by the majority"—whether a good-faith defense is available in section 1983 actions—"was largely answered" in the affirmative by the five concurring and dissenting justices. *Wyatt II, 994 F.2d at 1118*. The court accordingly held "that private defendants sued on the basis of *Lugar* may be held liable for damages under § 1983 only if they failed to act in good faith in invoking the unconstitutional state procedures, that is, if they either knew or should have known that the statute upon which they relied was unconstitutional." *Id.*

Other circuits followed suit. In *Jordan*, the Third Circuit noted "the [Supreme Court's] statement [in *Wyatt I*] that persons asserting section 1983 claims against private parties could be required to carry additional burdens, and the statements in *Lugar* which warn us [that] a too facile extension of section 1983 to private parties could obliterate the Fourteenth Amendment's limitation to state actions that **[*26]** deprive a person of constitutional rights and the statutory limitation of section 1983 actions to claims against persons acting under color of law." *20 F.3d at 1277* (cleaned up). Those considerations, the court said, lead to the conclusion that "'good faith' gives state actors a defense that depends on their subjective state of mind, rather than the more demanding objective standard of reasonable belief that governs qualified immunity." *Id.* The Sixth Circuit concurred in *Vector Research, 76 F.3d at 699*, as did the Ninth Circuit in *Clement, 518 F.3d at 1096-97*. Most recently, in a case decided after *Harris v. Quinn*, the Second Circuit allowed a good-faith defense to a section 1983 claim for reimbursement of agency fees paid prior to decision. *Jarvis v. Cuomo, 660 F. App'x 72, 75-76 (2d Cir. 2016)*.

Mr. Janus pushes back against these decisions with the argument that there is no common-law history before 1871 of private parties enjoying a good-faith defense to constitutional claims. As we hinted earlier, however, the reason is simple: the liability of private parties under section 1983 was not clearly established until, at the earliest, the Court's decision in *United States v. Price, 383 U.S. 787, 86 S. Ct. 1152, 16 L. Ed. 2d 267 (1966)*. For nearly 100 years, nothing would have prompted the question.

HN11[↑] We now join our sister circuits in recognizing that, under appropriate circumstances, a private party that acts under color **[*27]** of law for purposes of section 1983 may defend on the ground that it proceeded in good faith. The final question is whether

that defense is available to AFSCME.

**B. Good-faith Defense for AFSCME**

Although this is a new question for us, we note that every district court that has considered the precise question before us—whether there is a good-faith defense to liability for payments collected before *Janus II*—has answered it in the affirmative.[1] While those views are not binding on us, the unanimity of opinion is worth noting.

The first task we have under *Wyatt I* is to identify the

_____

[1] See *Hamidi v. SEIU Local 1000, 2019 WL 5536324 (E.D. Cal. Oct. 25, 2019)*; *LaSpina v. SEIU Pennsylvania State Council, 2019 WL 4750423 (M.D. Pa. Sept. 30, 2019)*; *Casanova v. International Ass'n of Machinists, Local 701*, No. 1:19-cv-00428, Dkt. #22 (N.D. Ill. Sept. 11, 2019); *Allen v. Santa Clara Cty. Correctional Peace Officers Ass'n, 2019 WL 4302744 (E.D. Cal. Sept. 11, 2019)*; *Ogle v. Ohio Civil Serv. Emp. Ass'n, 2019 WL 3227936 (S.D. Ohio July 17, 2019)*, appeal pending, No. 19-3701 (6th Cir.); *Diamond v. Pennsylvania State Educ. Ass'n, 2019 WL 2929875 (W.D. Pa. July 8, 2019)*, appeal pending, No. 19-2812 (3d Cir.); *Hernandez v. AFSCME California, 386 F. Supp. 3d 1300 (E.D. Cal. 2019)*; *Doughty v. State Employee's Ass'n*, No. 1:19-cv-00053-PB (D.N.H. May 30, 2019), appeal pending, No. 19-1636 (1st Cir.); *Babb v. California Teachers Ass'n, 378 F. Supp. 3d 857 (C.D. Cal. 2019)*; *Wholean v. CSEA SEIU Local 2001, 2019 U.S. Dist. LEXIS 70406, 2019 WL 1873021 (D. Conn. Apr. 26, 2019)*, appeal pending, No. 19-1563 (2d Cir.); *Akers v. Maryland Educ. Ass'n, 376 F. Supp. 3d 563 (D. Md. 2019)*, appeal pending, No. 19-1524 (4th Cir.); *Bermudez v. SEIU Local 521, 2019 WL 1615414 (N.D. Cal. Apr. 16, 2019)*; *Lee v. Ohio Educ. Ass'n, 366 F. Supp. 3d 980 (N.D. Ohio 2019)*, appeal pending, No. 19-3250 (6th Cir.); *Hough v. SEIU Local 521, 2019 WL 1274528 (N.D. Cal. Mar. 20, 2019)*, amended, *2019 U.S. Dist. LEXIS 46356, 2019 WL 1785414 (N.D. Cal. Apr. 16, 2019)*, appeal pending, No. 19-15792 (9th Cir.); *Crockett v. NEA-Alaska, 367 F. Supp. 3d 996 (D. Alaska 2019)*, appeal pending, No. 19-35299 (9th Cir.); *Carey v. Inslee, 364 F. Supp. 3d 1220 (W.D. Wash. 2019)*, appeal pending, No. 19-35290 (9th Cir.); *Cook v. Brown, 364 F. Supp. 3d 1184 (D. Or. 2019)*, appeal pending, No. 19-35191 (9th Cir.); *Danielson v. AFSCME, Council 28, 340 F. Supp. 3d 1083 (W.D. Wash. 2018)*, appeal pending, No. 18-36087 (9th Cir.). See also *Winner v. Rauner, 2016 U.S. Dist. LEXIS 175925, 2016 WL 7374258 (N.D. Ill. Dec. 20, 2016)* (post-*Harris* claim for fee reimbursement); *Hoffman v. Inslee, 2016 U.S. Dist. LEXIS 146276, 2016 WL 6126016 (W.D. Wash. Oct. 20, 2016)* (same). But see *Lamberty v. Connecticut State Police Union, 2018 U.S. Dist. LEXIS 179805, 2018 WL 5115559 (D. Conn. Oct. 19, 2018)* (dismissing for lack of standing but implying plaintiffs were entitled to previously withheld fees, plus interest).

"most closely analogous tort" to which we should turn for guidance. _504 U.S. at 164_ (citations and internal quotation marks omitted). Arguing in some tension with his statute-of-limitations position, Mr. Janus says that his claim lacks any common law analogue. His back-up position is that good faith is pertinent only if the underlying offense has a state-of-mind element, and he asserts that the most analogous tort in his case lacks such an element.

Mr. Janus compares the _First Amendment_ violation in his case to conversion. But that analogy does not work, at least **[*28]** with regard to the state's deduction of fair-share fees and its transfer of those fees to the union. Conversion requires an intentional and serious interference with "the right of another to control" a chattel. _Restatement (Second) of Torts § 222A_ (1965). At the time AFSCME received Mr. Janus's fair-share fees, he had no "right to control" that money. Instead, under Illinois law and _Abood_, the union had a right to the fees under the collective bargaining agreement with CMS. This rules out conversion. As the Supreme Court said in _Chicot Cnty. Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 60 S. Ct. 317, 84 L. Ed. 329 (1940)_, "the actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored." _Id. at 374_.

_HN12_[⬆] There are also at least two privileges that may be relevant to a conversion-style claim: authority based upon public interest, _Restatement (Second) of Torts § 265_ (1965), and privilege to act pursuant to court order, _Restatement (Second) of Torts § 266_ (1965). _Section 265_ provides that "one is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if he is acting in discharge of a duty or authority created by law to preserve the public safety, health, peace, or other public interest, and his act is reasonably necessary to the performance of his duty or the exercise of his authority." While **[*29]** the usual context for the assertion of this privilege is law enforcement, it is not too much of a stretch to apply it to the union's conduct here. CMS and AFSCME acted pursuant to state law. That sounds like action in discharge of a duty imposed by law. _Section 266_, which provides a privilege when one acts pursuant to a court order, is not directly applicable because there was no court order directing AFSCME to receive fair-share fees—_Abood_ was permissive, not mandatory. Nevertheless, CMS and AFSCME did rely on the Supreme Court's opinion upholding the legality of exactly this process.

AFSCME contends that the better analogy is to the tort of abuse of process. _HN13_[⬆] Abuse of process occurs where a party "uses a legal process, whether criminal or civil, against another 24 No. 19-1553 primarily to accomplish a purpose for which it is not designed." _Restatement (Second) of Torts § 682_ (1977). Alternatively, the most analogous tort might be interference with contract. See _Restatement (Second) of Torts § 766A_ (1979). Under the agency-fee arrangement, a certain portion of the salary CMS contracted to pay employees went instead to the union. This arguably made the contract less lucrative for objecting employees and violated their _First Amendment_ rights.

None of these torts is a perfect fit, **[*30]** but they need not be. We are directed to find the _most analogous_ tort, not the exact-match tort. This is inherently inexact. Although there are reasonable arguments for several different torts, we are inclined to agree with AFSCME that abuse of process comes closest. But perhaps the search for the best analogy is a fool's errand. As several district courts have commented, the Supreme Court in _Wyatt I_ embarked on the search for the most analogous tort only for _immunity_ purposes—the Court never said that the same methodology should be used for the good-faith defense. See, _e.g., Carey, 364 F. Supp. 3d at 1229-30; Babb, 378 F. Supp. 3d at 872-73; Diamond, 2019 U.S. Dist. LEXIS 112169, 2019 WL 2929875 at *25-26_. In the alternative, therefore, we leave common-law analogies behind and consider the appropriateness of allowing a good-faith defense on its own terms.

C. Good-faith Defense under _Wyatt I_

Like our sister circuits, _HN14_[⬆] we read the Court's language in _Wyatt I_ and _Lugar_, supplemented by Justice Kennedy's opinion concurring in _Wyatt I_, as a strong signal that the Court intended (when the time was right) to recognize a good-faith defense in _section 1983_ actions when the defendant reasonably relies on established law. This is not, we stress, a simple "mistake of law" defense. Neither CMS nor AFSCME made any mistake about the state **[*31]** of the law during the years between 1982 and June 27, 2018, when _Janus II_ was handed down. _Abood_ was the operative decision from the Supreme Court from 1977 onward, until the Court exercised its exclusive prerogative to overrule that case. Like its counterparts around the country, the State of Illinois relied on _Abood_ when it adopted a labor relations scheme providing for exclusive representation of public-sector workers and the remit of fair-share fees to the recognized union. The

union then relied on that state law in its interactions with other actors.

We realize that there were signals from some Justices during the years leading up to *Janus II* that indicated they were willing to reconsider *Abood*, but that is hardly unique to this area. Sometimes such reconsideration happens, and sometimes, despite the most confident predictions, it does not. See, *e.g.,* *Dickerson v. United States, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000)* (reaffirming the *Miranda* rule); see also *Agostini, 521 U.S. at 237* ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent." (cleaned up)). The Rule of Law requires that parties abide by, and be able to rely on, what the law *is*, rather than what the readers **[*32]** of tea-leaves predict that it might be in the future.

Notably, Mr. Janus does not allege that CMS and AFSCME, acting pursuant to state law, failed to comply with *Abood.* Mr. Janus says only that AFSCME did not act in good faith because it "spurned efforts to have agency fees placed in escrow while their constitutionality was determined." But AFSCME was under no legal obligation to escrow the fair-share fees for an indefinite period while the case was being litigated. Such an action, as AFSCME says, would (in the 26 No. 19-1553 absence of a court order requiring security of some kind) "have been hard to square with the fiduciary duty the Union owes to its own members," as the unit's exclusive representative.

Until *Janus II* said otherwise, AFSCME had a legal right to receive and spend fair-share fees collected from nonmembers as long as it complied with state law and the *Abood* line of cases. It did not demonstrate bad faith when it followed these rules.

D. Entitlement to Money Damages

No one doubts that Mr. Janus is entitled to declaratory and injunctive relief. The Supreme Court declared that the *status quo* violated his *First Amendment* rights and that "States and public-sector unions may no longer extract **[*33]** agency fees from nonconsenting employees." *138 S. Ct. at 2486.* Mr. Janus is now protected from that practice. Any remaining relief was for the district court to consider. That court declined to grant monetary damages, on the ground that AFSCME's good-faith defense shielded the union from such liability. We agree with that conclusion.

While this may not be all that Mr. Janus hoped for in this litigation, it is not unusual for remedies to be curtailed in light of broader legal doctrines. Moreover, though Mr. Janus contends that he did not want any of the benefits of AFSCME's collective bargaining and other representative activities over the years, he received them. Putting the *First Amendment* issues that concerned the Supreme Court in *Janus II* to one side, there was no unjust "windfall" to the union, as Mr. Janus alleges, but rather an exchange of money for services. Our decision in *Gilpin v. AFSCME, 875 F.2d 1310 (7th Cir. 1989)* is on point:

> [T]he union negotiated on behalf of these employees as it was required by law to do, adjusted grievances for them as it was required by law to do, and incurred expenses in doing these things ... . The plaintiffs do not propose to give back the benefits that the union's efforts bestowed on them. These benefits were rendered with **[*34]** a reasonable expectation of compensation founded on the collective bargaining agreement and federal labor law, and the conferral of the benefits on the plaintiffs would therefore give rise under conventional principles of restitution to a valid claim by the union for restitution if the union were forced to turn over the escrow account to the plaintiffs and others similarly situated to them.

*Id. at 1316.*

We have followed similar principles in the ERISA context. "If restitution would be inequitable, as where the payor obtained a benefit that he intends to retain from the payment that he made and now seeks to take back, it is refused." *Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Const. Corp., 258 F.3d 645, 651 (7th Cir. 2001)*; see also *Constr. Indus. Ret. Fund of Rockford, Ill. v. Kasper Trucking, Inc., 10 F.3d 465, 467 (7th Cir. 1993)* ("The welfare fund pooled the money to provide benefits for all persons on whose behalf contributions were made. Because the drivers received the health coverage for which they paid through the deductions Kasper sent to the fund, no one is entitled to restitution."); *UIU Severance Pay Tr. Fund v. Local Union No. 18-U, United Steelworkers of Am., 998 F.2d 509, 513 (7th Cir. 1993)* ("[B]ecause the cause of action we 28 No. 19-1553 are authorizing is equitable in nature, recovery will not follow automatically upon a showing that the Union contributed more than was required but only if the equities favor it." (internal quotation **[*35]** marks omitted)). We conclude that Mr. Janus has received all that he is entitled to: declaratory and injunctive relief, and a future free of any association

with a public union.

## IV

Before closing, we emphasize again that *HN15*[⬆] the good-faith defense to *section 1983* liability is narrow. It is not true, as Mr. Janus charges, that this defense will be available to "every defendant that deprives any person of any constitutional right." We predict that only rarely will a party successfully claim to have relied substantially and in good faith on both a state statute *and* unambiguous Supreme Court precedent validating that statute. But for those rare occasions, following the lead first of the Supreme Court in *Wyatt I* and second of our sister circuits, we recognize a good-faith defense for private parties who act under color of state law for purposes of *section 1983*.

We AFFIRM the judgment of the district court.

**Concur by:** MANION

## Concur

MANION, *Circuit Judge*, concurring. The court's opinion in this challenging case is thorough, and I concur with the court's ultimate conclusion. I have a couple additional thoughts. Some might observe that *Abood* had some benefit to the objectors because they no longer had to pay service fees equal to union dues **[*36]** as a condition of employment. But for 41 years, the nonunion employees had to pay their "fair share."

The unions received a huge windfall for 41 years. As the Supreme Court acknowledged in *Janus II, Abood* was wrong, so the unions got what the Court called a "considerable windfall." The Court in *Janus II* sums it up pretty well:

> We recognize that the loss of payments from nonmembers may cause unions to experience unpleasant transition costs in the short term, and may require unions to make adjustments in order to attract and retain members. But we must weigh these disadvantages against the considerable windfall that unions have received under *Abood* for the past 41 years. It is hard to estimate how many billions of dollars have been taken from nonmembers and transferred to public-sector unions in violation of the *First Amendment*. Those unconstitutional exactions cannot be allowed to continue indefinitely.

*Janus v. AFSCME, Council 31, 138 S. Ct. 2448, 2485-86, 201 L. Ed. 2d 924 (2018)*.

Even though the Supreme Court reached the wrong result in *Abood* 41 years before *Janus II*, the unions justify their acceptance of many millions of dollars because they accepted the money in "good faith." Probably a better way of looking at it would be to say rather than good faith, they had very "good **[*37]** luck" in receiving this windfall for so many years. Since the court is not holding that the unions must repay a portion of the windfall, they can remind themselves of their good luck for the years ahead.

---

End of Document

 Neutral

As of: November 19, 2019 10:44 PM Z

# Laspina v. SEIU Pa. State Council

United States District Court for the Middle District of Pennsylvania

August 29, 2019, Decided; August 29, 2019, Filed

CIVIL ACTION NO. 3:18-2018 (JUDGE MANNION)

**Reporter**

2019 U.S. Dist. LEXIS 147506 *; 2019 WL 4081900

BETHANY LASPINA, on behalf of herself and others similarly situated, Plaintiffs, v. SEIU PENNSYLVANIA STATE COUNCIL, et al., Defendants

**Subsequent History:** Dismissed by, in part, Dismissed by, in part, Without prejudice *Laspina v. Seiu Pa. State Council, 2019 U.S. Dist. LEXIS 155171 (M.D. Pa., Sept. 11, 2019)*

Dismissed by, in part, Dismissed by, in part, Without prejudice *Laspina v. SEIU Pa. State Council, 2019 U.S. Dist. LEXIS 168917 (M.D. Pa., Sept. 30, 2019)*

## Core Terms

motion to dismiss, class certification, alleges, class member, juridical, purported, class representative, state law claim, rights, supplemental jurisdiction, named plaintiff, standing to sue, fair share, cause of action, district court, class action, the Rule, employees, cases, public employee, contends

**Counsel:** **[*1]** For Bethany LaSpina, on behalf of herself and all othr similarly siutated, Plaintiff: Edmond R. Shinn, LEAD ATTORNEY, Law Offices of Edmond R. Shinn, Esq., Ltd., Fort Washington, PA; Jonathan F Mitchell, LEAD ATTORNEY, Mitchell Law PLLC, Austin, TX; Shannon W Conway, Talcott J Franklin, LEAD ATTORNEY Talcott Franklin P.C., Dallas, TX; Walter S Zimolong, LEAD ATTORNEY, Zimolong LLC, Villanova, PA.

For SEIU Pennsylvania State Council, Defendant: Martin W Milz, SPEAR WILDERMAN, P.C., Philadelphia, PA; Samuel L Spear, Spear, Wilderman, Borish, Endy, Spear & Runckel, Philadelphia, PA.

For SEIU Local 668, Defendant: Lauren M. Hoye, Willig, Williams & Davidson, Philadelphia, PA; P. Casey Pitts, Scott A Kronland, Altshuler Berzon LLP, San Francisco, CA.

For Scranton Public Library, Defendant: J. Timothy Hinton, Haggerty Hiinton & Cosgrove LLP, Scranton, PA.

**Judges:** MALACHY E. MANNION, United States District Judge.

**Opinion by:** MALACHY E. MANNION

# Opinion

## MEMORANDUM

Pending before the court are the motions to dismiss, the second amended complaint ("SAC"), (Doc. 66), of plaintiff Bethany LaSpina filed by defendant unions SEIU[1] Local 32BJ ("Local 32BJ"), (Doc. 46), the Pennsylvania Joint Board of Workers United ("JBWU"), (Doc. 52), **[*2]** and SEIU Healthcare PA, (Doc. 59). They claim she fails to state a claim upon which relief may be granted pursuant to *Fed.R.Civ.P. 12(b)(6)* since she was not a member of these unions and, fails to have Article III standing to pursue class action claims on behalf of members and former members of these unions pursuant to *12(b)(1)*. For the reasons that follow, the motions to dismiss will be **GRANTED** and plaintiff's federal claims against union defendants will be **DISMISSED WITH PREJUDICE**.

## I. BACKGROUND

In this purported class action lawsuit, filed pursuant to *42 U.S.C. §1983*, the plaintiff claims that she was unconstitutionally required to pay union dues.[2] Plaintiff

_____

[1] Service Employees International Union ("SEIU").

[2] The facts alleged in plaintiff's SAC must be accepted as true in considering the union defendants' motions to dismiss. *See Dieffenbach v. Dept. of Revenue, 490 Fed.Appx. 433, 435 (3d*

alleges that she is employed by the Lackawanna County Library System and that she works at the Scranton Public Library. Plaintiff alleges that she was forced to join defendant union SEIU Local 668 ("Local 668") and to pay dues to this union as a condition of her employment. She alleges that she was unaware that she was not required to be a member of Local 668, and that if she was aware of this, she would have refused to join the union and instead pay "fair share fees."[3] Plaintiff alleges that her employer told her that she was legally required to pay union dues to **[*3]** Local 668. Plaintiff further alleges that since she was not advised of her right not to join Local 668, this union did not obtain her free and informed consent to be a member of it.

Plaintiff also alleges that her *First Amendment* rights were violated when Local 668 continued to take dues from her after she resigned her membership in the union.

In Counts 1, 2 and 3 of her SAC, plaintiff raises constitutional claims against defendants under *42 U.S.C. §1983*. Further, plaintiff seeks relief under the *Declaratory Judgment Act*, *22 U.S.C. §2201*, requesting a permanent injunction enjoining defendants from accepting dues or fees unless the employees have given their consent to join the unions.[4] Plaintiff also raises state law claims for conversion, trespass to chattels, replevin, restitution, and unjust enrichment.

---

*Cir. 2012)*; *Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005)*.

[3] Fair share fees are charges non-union member employees had to pay unions to finance the union's collective bargaining activities. However, in *Janus v. American Federation of State, County, and Municipal Employees, Council 31, — U.S. —, 138 S. Ct. 2448, 201 L. Ed. 2d 924 (2018)*, the Supreme Court held that it was a violation of the *First Amendment* for public sector unions to require non-members to pay fair share fees. In *Janus, 138 S. Ct. at 2459*, the Supreme Court held that "[s]tates and public-sector unions may no longer extract agency fees from nonconsenting employees." Following Janus, Pennsylvania's statute allowing the collection of "fair share" fees from non-members by unions is no longer enforceable. *See Hartnett v. Pennsylvania State Education Association, —F.Supp.3d —, 2019 U.S. Dist. LEXIS 83755, 2019 WL 2160404 (M.D.Pa. May 17, 2019)*.

[4] In *Hartnett, — F.Supp.3d —, 2019 U.S. Dist. LEXIS 83755, 2019 WL 2160404*, the court held that plaintiff's claims for declaratory and injunctive relief were moot since the union defendant stopped the collection of agency fees (i.e., "fair share" union fees) from non-members in light of Janus. *See also* collection of cases cited in Hartnett.

Also named as defendants are SEIU Pennsylvania State Council, Local 668, Lackawanna County Public Library System, and Scranton Public Library.[5]

Additionally, plaintiff purports to bring claims on behalf of public employee members and former members of the defendant union affiliates of SEIU Pennsylvania State Council alleging that they were unconstitutionally required to pay union dues and fair share **[*4]** fees. She seeks to raise *First Amendment* claims and state law claims on behalf of public employees who were allegedly forced to pay dues and fair share fees to the defendant unions.

Plaintiff further purports to bring claims on behalf of all employees in bargaining units represented by affiliates of SEIU Pennsylvania State Council who were subjected to union-related payroll deductions to which they did not knowingly consent.

As relief, plaintiff seeks a refund of all of the dues she paid to Local 668. Plaintiff also seeks to require the other defendant unions to refund all dues and fees they received from her. Additionally, plaintiff seeks punitive damages for herself and for members of all defendant unions who resigned from the unions or requested that the unions stop taking dues or fees after the Janus decision and who continued to have dues or fees withdrawn from their pays.

Plaintiff is proceeding on her SAC filed January 28, 2019. (Doc. 66). On January 14, 2019, Local 32BJ filed its motion to dismiss.[6] (Doc. 46). Also on January 14, 2019, JBWU filed its motion to dismiss, (Doc. 52). On January 16, 2019 Healthcare PA filed its motion to dismiss, (Doc. 59).

The motions to dismiss of Local 32BJ, JBWU **[*5]** and Healthcare PA (collectively "defendant unions") have been briefed. The court now jointly considers the three motions to dismiss. In fact, plaintiff filed one brief in opposition to the three motions, (Doc. 74), and the

---

[5] Also pending in this case are the motions to dismiss filed by defendants SEIU Pennsylvania State Council ("State Council"), (Doc. 53), Local 668, (Doc. 70), and Scranton Public Library, (Doc. 88). The court will address these other motions in separate decisions.

[6] Although the three defendant unions filed their motions to dismiss pertaining to plaintiff's amended complaint, the court converted all of the pending motions to dismiss plaintiff's amended complaint into motions to dismiss her SAC. (Doc. 67).

defendant unions filed a joint reply brief in support of their motions. (Doc. 77).

The court has jurisdiction over this case pursuant to *28 U.S.C. §1331* and *28 U.S.C. §1343(a)* because plaintiff avers violations of his rights under the U.S. Constitution. The court can exercise supplemental jurisdiction over plaintiff's state law claims under *28 U.S.C. §1337*. Venue is appropriate in this court since the alleged constitutional violations occurred in this district. *See 28 U.S.C. §1391*.

## II. DISCUSSION[7]

Defendant unions argue that plaintiff's allegations against them fail to state a cognizable claim since she only alleges that she was a member of Local 668 and not that she was a member of defendant unions at any time. Defendant unions also point out that all of the plaintiff's stated allegations regarding her constitutional claims concern Local 668 and do not pertain to them. Defendant unions further state that plaintiff fails to allege that they took any dues/fees from her or caused her any harm. Thus, defendant unions state that **[*6]** since

_____

[7] Since the standard of review applicable to the defendant's motion to dismiss under *Rule 12(b)(6)* is stated in the briefs of the parties, the court does not repeat it herein. Suffice to say that "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. Also, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. **Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 321 (3d Cir. 2008)**.

*Rule 12(b)(1)* provides for the dismissal of a complaint based on a "lack of subject-matter jurisdiction." *FED. R. CIV. P. 12(b)(1)*. "A motion to dismiss under *Rule 12(b)(1)* challenges the jurisdiction of the court to address the merits of the plaintiff's complaint." *Vieth v. Pennsylvania, 188 F. Supp. 2d 532, 537 (M.D.Pa. 2002)*. Because the district court is a court of limited jurisdiction, the burden of establishing subject matter jurisdiction always rests upon the party asserting it. *See Kokkonen v. Guardian Life. Ins. Co. of America, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed 2d 391 (1994)*. Further, since defendant unions' motions to dismiss for lack of subject matter jurisdiction "attacks the complaint on its face","the court must consider the allegations of the complaint as true." *Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)*.

plaintiff fails to allege any facts showing that she was injured or caused any harm by them, she lacks standing to sue them under Article III and she fails to state a cognizable claim against them.

To state a claim under *§1983*, a plaintiff must meet two threshold requirements. She must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, she was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. *West v. Atkins, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)*; *Parratt v. Taylor, 451 U.S. 535, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981)*, overruled in part on other grounds, *Daniels v. Williams, 474 U.S. 327, 330-331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)*. *See also* Kneipp v. Tedder, *95 F.3d 1199, 1204 (3d Cir. 1996)* (To state an actionable claim under *§1983*, plaintiff must prove that someone deprived her of a constitutional right while acting under the color of state law). Liability in a civil rights action under *§1983* cannot be predicated solely on the operation of *respondeat superior*. Sutton v. Rasheed, *323 F.3d 236, 249 (3d Cir. 2003)*. Rather, liability under *section 1983* is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or actual knowledge and acquiescence. *See* Robinson v. City of Pittsburgh, *120 F.3d 1286 (3d Cir. 1997)* (overturned on other grounds) (citing Rode v. Dellarciprete, *845 F.2d 1195, 1207 (3d Cir. 1988)*). Acquiescence exists where "a supervisor with authority over a subordinate knows that the subordinate **[*7]** is violating someone's rights but fails to act to stop the subordinate from doing so." Festa v. Jordan, *803 F. Supp. 2d 319, 325 (M.D. Pa. 2011)* (citation omitted). Further, "[a]llegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode, 845 F.2d at 1207*.

No doubt that plaintiff has failed to allege that defendant unions were personally involved in the violation of her constitutional rights. Nor can plaintiff attempt to hold defendant unions vicariously liable for the alleged unconstitutional conduct of Local 668. Plaintiff's SAC contains no facts to support a claim against defendant unions and it does not allege that they were personally involved in the violation of her constitutional rights. Rather, plaintiff's allegations relate to her employer and the union to which she belonged, Local 668, not defendant unions. As stated, plaintiff alleges that the actions of Local 668 violated her rights since it improperly took dues from her and failed to obtain her consent to take dues out of her pay. Thus, plaintiff's

allegations fail to show that defendant unions committed any unlawful actions against her and that these unions caused her any injury.

Plaintiff concedes that if she was only suing defendant **[\*8]** unions as an individual she would not have standing to sue Healthcare PA, Local 32BJ, or the JBWU since she never belonged to or paid fees to these unions. However, plaintiff states that she can sue the stated unions since she is suing as a class representative and "she seeks to represent all public employees who were compelled to subsidize the affiliates of the SEIU Pennsylvania State Council." In her pleading, she has alleged that the State Council "coordinates and unifies the collective political, administrative, and communication structures of all SEIU locals", and that the local unions are "affiliated" with the State Council. The SAC also alleges that Healthcare PA, Local 32BJ, and the JBWU "enforced unconstitutional agency shops before the Supreme Court's ruling in _Janus_ and violated the constitutional rights of the plaintiff class members by tapping their paychecks against their will."

Thus, plaintiff contends that even though she was not a member of the three defendant unions and cannot sue them in her individual capacity, she has standing to sue them to claim they forced fees in violation of the Constitution as a representative of a class of plaintiffs who were actually members **[\*9]** of these unions and have standing to sue these unions. In short, plaintiff contends that since the putative class members have Article III standing to sue defendant unions she, as the class representative, does not need standing in her own right to sue these unions.

Additionally, plaintiff states that it is premature to determine whether her proposed classes can be certified under _Fed.R.Civ.P. 23_ since the parties have not yet conducted discovery on class certification and since the court postponed the class certification deadline as requested by the parties until it decided the pending motions to dismiss. (Doc. 96). As such, plaintiff states that "[t]his court has not ruled on whether [she] may represent the absent class members, and it cannot rule on the [union] defendants' standing objections until the class-certification issues are resolved." For support, plaintiff cites to _Haas v. Pittsburgh National Bank, 526 F.2d 1083 (3d Cir. 1975)_.

Plaintiff further contends that under "juridically links" doctrine, which is an exception to the general rule that a class representative "cannot represent those having

causes of action against other defendants against whom the plaintiff has no cause of action and from whose hands he suffered no injury." She cites again **[\*10]** to _Haas, 526 F.2d at 1088_ and n. 3, as well as other cases. (Doc. 74 at 4). In addition to the so-called exception where there is a juridical link between defendants, plaintiff cites to _LaMar v. H&B Novelty Loan Co., 489 F.2d 461 (9th Cir. 1973)_, and contends that _Rule 23_ provides another exception to the standing requirement where defendants engaged in a conspiracy or concerted scheme.

In any event, plaintiff maintains that the issue of whether she can represent her proposed class under _Haas_ and the juridical-links doctrine, as well as under the _LaMar_ exception, is an issue that has to be first resolved at the _Rule 23_ class certification stage and not on _Rule 12(b)(1)_ and _(6)_ motions. Plaintiff states that she has sufficiently alleged in her SAC that she has standing to sue defendant unions as a class representative, and that "she needs only to propose a class that includes public employees who were allegedly injured by each of the [three] union defendants." Plaintiff thus states that the class certification issues must come before the Article III standing issues defendant unions raise in their motions to dismiss.[8]

"_[Rule] 12(b)(1)_ governs a motion to dismiss for lack of standing, since 'standing is a jurisdictional matter.'" _Polanco v. Omnicell, Inc., 988 F.Supp.2d 451, 459 (D.N.J. 2013)_ (citation omitted). "Standing 'is a threshold jurisdictional requirement, **[\*11]** derived from the 'case or controversy' language of Article III of the Constitution.'" _Id._ (citation omitted). "A plaintiff must establish his or her standing to bring a case in order for the court to possess jurisdiction over his or her claim. _Id._ (citation omitted).

"Article III governs constitutional standing and limits [the court's] jurisdiction to actual "cases or controversies." _Neale v. Volvo Cars of North America, LLC, 794 F.3d 353, 358-59 (3d Cir. 2015)._[9] "Article III requires a plaintiff to demonstrate '(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" _Id._

---

[8] Plaintiff concedes that the third-party standing doctrine is not applicable in this case.

[9] The court notes that although the _Neale_ case involved class certification, it is addressed herein based on the Third Circuit's discussion on Article III standing.

(citations omitted). *See also Anjelino v. N.Y. Times Co., 200 F.3d 73, 88 (3d Cir. 2000)* ("Standing is established at the pleading stage by setting forth specific facts that indicate that the party has been injured in fact or that injury is imminent, that the challenged action is causally connected to the actual or imminent injury, and that the injury may be redressed by the cause of action."). "Standing requires that the party seeking to invoke federal jurisdiction 'demonstrate standing for each claim he seeks to press.'" *Neale, 794 F.3d at 359* (citation omitted).

No doubt that plaintiff herself, the only named plaintiff and class representative, was not injured **[*12]** by defendant unions and she does not have standing on her own to bring individual claims against them. Thus, she has no case or controversy with defendant unions. Nonetheless, plaintiff contends that at this stage of the case she only has to propose a class that includes public employees who were allegedly injured by each of the three defendant unions. She states that until the *Rule 23* class certification is decided by the court she can still represent the class members who were members of these unions, who were allegedly injured by these unions, and who have claims against these unions. Therefore, plaintiff argues that it is premature to dismiss the defendant unions prior to the court deciding at class certification whether she can represent the class members who do have claims against these unions.

In *Neale, 794 F.3d at 359*, the Third Circuit stated, "[i]n the context of a class action, Article III must be satisfied 'by at least one named plaintiff.'" (citing *McNair, 672 F.3d at 223*; *see also O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L. Ed. 2d 674 (1974)* ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.")).

Here, plaintiff is attempting **[*13]** to put the *Rule 23* class certification issue before the Article III standing issue. The court finds that Article III requires that the issue of whether plaintiff has standing to assert claims on behalf of purported class members against defendant unions must be decided before the court decides the issue of class certification under *Rule 23*. The named plaintiff must first demonstrate she is properly before the court, i.e., has Article III standing, and then the issue to be decided is whether she complies with the provisions of *Rule 23* with respect to the purported class members. Indeed, as the Third

Circuit stated in *Neale, 794 F.3d at 362*, "unnamed, putative class members need not establish Article III standing", rather, "the 'cases or controversies' requirement is satisfied so long as a class representative has standing." Thus, the class representative, i.e., the plaintiff, must first have Article III standing regarding defendant unions before the court decides whether she can represent the purported class members who were members of defendant unions and who were allegedly injured by them.

Additionally, the court finds no merit to plaintiff's contention that *Rule 23* class certification issue must be decided before the standing **[*14]** issue raised in defendant unions' *Rule 12(b)* motions to dismiss. *See Polanco, 988 F.Supp.2d at 464* ("Because Plaintiff's standing to bring a claim against [defendant] is a threshold jurisdictional requirement, the Court considers this argument at the outset.") (internal citation omitted). *See also Rabin v. NASDAQ OMX PHLX LLC, 182 F.Supp.3d 220, 229 (E.D.Pa. 2016)* (court held that plaintiff must first be able to satisfy the requirements of Article III standing prior to conducting the *Rule 23* class certification analysis since "[a] federal rule cannot alter a constitutional requirement.") (citations omitted); *In re Franklin Mut. Funds Fee Litigation, 388 F.Supp.2d 451, 460 (D.N.J. 2005)* ("Standing is a threshold inquiry, not a mere hurdle that can be cleared with the assistance of *Rule 23*."); *Holve v. McCormick & Company, Inc., 334 F.Supp.3d 535, 547-48 (W.D.N.Y. 2018)*.

As the Third Circuit in *Neale, 794 F.3d at 360*, explained:

[C]onsiderations under *Rule 23* are themselves procedural rules, and thus rarely can be antecedent to the question of whether a federal court has jurisdiction to hear at all. *See 28 U.S.C. §2072(a), (b)* (authorizing the Supreme Court to prescribe "general rules of practice and procedure," but providing that those rules "shall not abridge, enlarge or modify any substantive right"); *Fed.R.Civ.P. 82* (stating that the Federal Rules of Civil Procedure "do not extend or limit the jurisdiction of the district courts"); 1 William B. Rubenstein, Newberg on Class Actions §1:1 (5th ed. 2012) ("*Rule 23* is, therefore, **[*15]** fundamentally a procedural device: it cannot ordinarily be construed to extend or limit the jurisdiction and venue of federal courts."). What is more, the Supreme Court has recently explained that "statutory standing" is "misleading, since 'the absence of a valid (as opposed to arguable) cause

of action does not implicate subject-matter jurisdiction.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc., ---U.S. ----, 572 U.S. 118, 134 S.Ct. 1377, 1387 n. 4, 188 L.Ed.2d 392 (2014)* (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 642-43, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002))*. Because a federal court has a "bedrock obligation to examine both [its] own subject matter jurisdiction and that of the district courts," *Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 117 & n. 5 (3d Cir. 1997)*, it is improper to "resolve contested questions of law when its jurisdiction is in doubt." *Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)*.

In this case, there is no dispute that plaintiff herself has not been injured by defendant unions. These defendant unions are separate and distinct from Local 668, the union to which plaintiff belonged and allegedly caused her injury. "[S]tanding cannot be predicated on an injury which the plaintiff has not suffered, nor can it 'be acquired through the back door of a class action.'" *In re Franklin Mut. Funds Fee Litigation, 388 F.Supp.2d at 461* (citing *Allee v. Medrano, 416 U.S. 802, 828-29, 94 S.Ct. 2191, 40 L. Ed. 2d 566 (1974)*; *Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 734 (3d Cir. 1970)* ("[A] predicate to appellee's right to represent a class is his eligibility to sue in his own right. What he may not achieve himself, **[*16]** he may not accomplish as a representative of a class.")).

Moreover, plaintiff's reliance on *Haas* is misplaced. The *Haas* case involved class certification under *Rule 23* and not Article III standing. In *Haas*, the Third Circuit only decided the issue of whether the plaintiff who had standing to sue a specific defendant could serve as the class representative under *Rule 23* for class members who had "closely related" claims against the same defendant, (i.e., Mellon Bank), not other defendants. The plaintiff in Haas herself had direct claims against Mellon Bank and the Third Circuit found that for purposes of class certification, plaintiff's direct claims were "closely related" to the claims of the purported class members since the harm they suffered by the same defendant was the same (excessive fees charged to cardholders), they arose out of the same agreements, and the harm they allegedly suffered arose under the same statute. *See Rabin, 182 F.Supp.3d at 228* ("[U]nder Haas, a plaintiff with claims against one defendant can maintain similar claims that other class members have against **that defendant**.") (emphasis added).

As union defendants state in their reply brief, "Haas does not hold that a plaintiff has standing to bring class **[*17]** claims against defendants she lacks standing to sue individually." In the instant case, there is no named plaintiff who was a member of defendant unions and who was injured by these unions. Our plaintiff's alleged injury is not "fairly traceable" to the actions of defendant unions.

The court in *Polanco, 988 F.Supp.2d at 464*, discussed the requirements of Article III standing and stated:

> The fact "[t]hat a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Lewis v. Casey, 518 U.S. 343, 356, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)*. (citations omitted). Moreover, "plaintiff may not maintain an action on behalf of a class against a specific defendant if the plaintiff is unable to assert an individual cause of action against that defendant[,]" "[w]hether for reasons of lack of standing ... or for lack of *Rule 23(a)(3)* typicality[.]" *See Haas v. Pittsburgh Nat. Bank, 526 F.2d 1083, 1086 n. 18 (3d Cir. 1975)* (citations omitted).

As such, Haas does not apply in this case since there is no dispute that plaintiff individually has no standing to assert any claim against unions defendants. *See Rabin , 182 F.Supp.3d at 230* ("In Haas, the plaintiff **[*18]** could only adopt class members' claims against defendants the plaintiff could already sue for other claims; he was not permitted to adopt claims against additional defendants.") (citing *Haas, 526 F.2d at 1095*); *In re Franklin Mut. Funds Fee Litigation, 388 F.Supp.2d at 462* ("[I]f the named plaintiffs cannot or do not assert their own direct claim against a named defendant, they may not bring a claim against that defendant on behalf of other investors.").

As discussed, plaintiff failed to allege in her SAC any specific conduct by union defendants that is "fairly traceable" to her alleged injury. Thus, plaintiff lacks standing to sue union defendants. *See Polanco, 988 F.Supp.2d at 465*; *Rabin, 182 F.Supp.3d at 230-31*.

Further, the Third Circuit has not adopted the LaMar exceptions and the juridical link doctrine.

The court in *Byrd v. Aaron's Inc., 14 F. Supp. 3d 667,*

682-83 (W.D.Pa. 2014), rev'd on other grounds (i.e., on district court's *Rule 23* class certification analysis), *784 F.3d 154 (3d Cir. 2015)*, addressed the LaMar exceptions and the juridical link doctrine and stated:

> This juridical link doctrine was first mentioned in *LaMar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973)*, which held in assessing *Rule 23*'s typicality requirement that "a plaintiff who has no cause of action against the defendant cannot fairly and adequately protect the interests of those who do have such causes of action ... even though the plaintiff may have suffered an identical injury at the hands of a **[*19]** party other than the defendant." *Id. at 466*. The *LaMar* Court then suggested, in dicta and without further discussion, that there may be two exceptions to that rule: One exception covers cases in which the named plaintiff's injuries were "the result of a conspiracy or concerted schemes between the defendants" and another exception covers cases in which it would be "expeditious" to combine the defendants into one action because they are "juridically related." Id.

As stated, the Third Circuit has not adopted the juridical link doctrine and while it mentioned the doctrine and the *LaMar* exceptions in *Haas, 526 F.2d at 1096*, and n. 18, it "did so in the context of tolling a statute of limitations time bar in [the] case that had been certified as a class action." *Id.* This court concurs with the case of *6803 Blvd. East, LLC v. DIRECTV, LLC, 17 F.supp.3d 427, 432 (D.N.J. 2014)*, in which it was stated that "[t]his court ...rejects an approach that would allow plaintiffs to use the juridical link doctrine—developed in the *Rule 23* context—to circumvent the constitutional Article III requirement that they demonstrate standing as to each defendant."

This court also finds the Second Circuit's rejection of the LaMar's juridical link doctrine **[*20]** more persuasive. In *Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 64 (2d Cir. 2012)* (internal citations and quotations omitted), the Second Circuit examined the doctrine and stated:

> [W]hether or not *Rule 23* would permit a plaintiff to represent a class against non-injurious defendants cannot affect the plaintiff's Article III standing to sue the non-injurious defendants. A federal rule [of procedure] cannot alter a constitutional requirement. It is well established that a plaintiff must demonstrate standing for each claim she seeks to press. Thus, with respect to each asserted claim, a plaintiff must always have suffered a

distinct and palpable injury to herself. In no event ... may Congress abrogate the Article III minima ....

The Court in Mahon, *id. at 64*, "also disagree[d] with the approach that analyzes class certification before Article III standing and treats the class as the relevant legal entity."

Moreover, the court finds that the juridical link doctrine does not apply to its Article III standing analysis. "The juridical link doctrine has no bearing on standing; rather, its place lies in a *Rule 23* analysis." *In re Franklin Mut. Funds Fee Litigation, 388 F.Supp.2d at 462 n. 7* (citing *Matte v. Sunshine Mobile Homes, Inc., 270 F.Supp.2d 805, 822 (W.D.La. 2003)* **[*21]** (concluding that the "juridical links doctrine has no bearing on the issue of standing"); *Henry, 223 F.R.D. 541, 544 (D.Nev. 2004)* (stating that a "doctrine developed under *Rule 23* based on judicial efficiency and expedience does not play a role in an Article III standing analysis"); ***In re Eaton Vance Corp. Secs. Litig., 220 F.R.D. 162, 171 (D.Mass. 2004)*** (same)).

As such, the motions to dismiss of union defendants will be granted. Plaintiff's claims against these three defendants will be dismissed with prejudice since plaintiff has already amended her complaint and it would be futile and unduly prejudicial to defendants to allow her to amend her pleading another time as against them since she lacks standing under Article III.

Finally, considering judicial economy, convenience and fairness to the litigants, the district court in its discretion is permitted to decline the exercise of supplemental jurisdiction over state law claims if the court has dismissed all of the claims over which it had original jurisdiction. Kach v. Hose, *589 F.3d 626, 650 (3d Cir. 2009)* (citations omitted). See *Patel v. Meridian Health System, Inc., 666 Fed.Appx. 133, 136 (3d Cir. 2016)* ("A district court 'may decline to exercise supplemental jurisdiction' over state law claims if it 'has dismissed all claims over which it has original jurisdiction[,]' unless considerations of judicial economy, convenience, or fairness to the parties provide an affirmative justification for exercising supplemental jurisdiction.") **[*22]** (citing *Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000)*. The court has made the appropriate considerations and finds no extraordinary circumstances exist in this case to exercise supplemental jurisdiction over plaintiff's remaining Pennsylvania state law claims against union defendants. Since plaintiff's federal claims over which this court had original jurisdiction shall not be permitted to proceed to trial against union defendants, the court, in

its discretion, declines to exercise supplemental jurisdiction over plaintiff's state law claims against union defendants. *Id.*; see also *28 U.S.C. §1367(c)(3)*; *Verdecchia v. Prozan, 274 F.Supp.2d 712, 728 (W.D. Pa. 2003)*.

As such, plaintiff's state law claims against union defendants shall be dismissed without prejudice. *Kach, 589 F.3d at 650* ("If a district court decides not to exercise supplemental jurisdiction and therefore dismisses state-law claims, it should do so without prejudice, as there has been no adjudication on the merits.") (citation omitted).

## III. CONCLUSION

Based on the foregoing reasons, the court will **GRANT** the motions to dismiss plaintiff's SAC, (Doc. 66), of union defendants, SEIU Local 32BJ, (Doc. 46), the Pennsylvania Joint Board of Workers United, (Doc. 52), and SEIU Healthcare PA, (Doc. 59), with respect to her federal claims against them, and plaintiff's federal **[*23]** claims against union defendants shall be **DISMISSED WITH PREJUDICE**. Plaintiff's state laws claims against union defendants shall be **DISMISSED WITHOUT PREJUDICE**. An appropriate order shall issue.

s/ Malachy E. Mannion

**MALACHY E. MANNION**

**United States District Judge**

**Date: August 29, 2019**

End of Document